**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **FORUM US, INC.** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:21-CV-02015** |
| | § | |
| **BORETS U.S., INC.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **Defendant.** | § | |
| | § | |

## PLAINTIFF FORUM US, INC.'S ORIGINAL COMPLAINT

Plaintiff Forum US, Inc. ("Plaintiff" or "Forum") hereby files this Original Complaint against Defendant Borets U.S., Inc. ("Defendant" or "Borets"). Forum complains and alleges against Borets as follows.

### I.     PARTIES

1.     Plaintiff Forum US, Inc. ("Forum") is a corporation organized under the laws of the State of Delaware with its principal place of business at 10344 Sam Houston Park Dr., Suite 300, Houston, Texas 77064-4666.

2.     Defendant Borets US, Inc. is a Delaware corporation, which is registered to do business in the State of Texas. Defendant Borets may be served through its Texas registered agent for service of process: Capitol Corporate Services, Inc., 206 E. 9th Street, Suite 1300 Austin, TX 78701-4411.

## II.    JURISDICTION AND VENUE

3.      This Complaint includes claims for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1338.

4.      Defendant Borets is subject to personal jurisdiction due to its contacts with the State of Texas, and in particular with the Southern District of Texas. Borets regularly transacts business within this District, including at its regional headquarters and sales office at 10497 Town and Country Way, Ste. 310, Houston, Texas, USA 77024. Defendant Borets has committed acts of infringement in this district, including but not limited to manufacturing, selling, offering to sell and/or importing infringing products in this District.

5.      Venue is proper pursuant to 28 U.S.C. §§1391(b)-(c) and 28 U.S.C. § 1400(b). Borets resides in this District by virtue of its place of business at 10497 Town and Country Way Ste. 310, Houston, Texas, USA 77024, which Borets refers to as its "Regional Headquarters." Borets also has a regular and established place of business in this District by virtue of its regional headquarters, where infringing acts were committed including selling, offering for sale, manufacturing, and/or importing the infringing products.

## III.    FORUM'S REVOLUTIONARY SANDGUARD™ TECHNOLOGY

6.      Forum provides well services and products that enhance the abilities of artificial lift systems in the oil and gas industry, such as downhole pumps. One such product is marketed as the SandGuard™, a tool that revolutionized sand management for wells using downhole pumps.

7.      Prior to the invention of the SandGuard™ technology, sand buildup was a serious problem for operators and service providers in shale formations. Shale wells are primary candidates for multi-zone fracking, which is the process of high-pressure injection of "fracking

fluid" into multiple sections or zones of a well. This creates cracks in the formation that make it easier for the oil in the formation to escape from the fracked production zones. The fracking fluid contains sand or other solid particles called "proppants," which quite literally prop the fractures in the formation open. While most wells include some amounts of proppant, shale wells include significant amounts of injected proppant due to the number of producing zones in their long lateral sections. Injected sand can create major problems for a downhole pump during the production phase of a shale well, as explained in reference to Figures 1A to 1C below.



**FIG. 1A**
**(Normal Pumping)**

**FIG. 1B**
**(Pump Shutdown)**

**FIG. 1C**
**(Pump Restart)**

8.     As shown in **Figure 1A**, during the production phase a downhole pump is used to pump fluid out of a well through production tubing. The pump creates enough pressure to carry the fluid and solid particles to the surface, where the wellhead and other surface equipment resides.

In a perfect world, the downhole pump would not shut down until production of fluids from the well is complete. In the less-than-perfect real world, downhole pumps shut down several times over the life of a well for any number of reasons. For example, an electrical power outage (storms or downed power lines) is one possible reason a pump may shut down.

9.      As shown in **Figure 1B**, when a shutdown occurs the fluid and solid particles (e.g., proppant injected during the fracking phase) that are in the production tubular begin to flow downwardly by gravity towards the pump, until the fluid level equalizes. When the fluid stops flowing, the solid particles in the fluid continue to flow downwardly by gravity through the fluid toward the pump. These particles begin to accumulate on or in the pump, building up until they form a plug.

10.     As shown in **Figure 1C**, when the pump starts up again it operates at higher flow rate and lower pressure as it attempts to clear the solid plug that has formed.  Sometimes, the pump can clear the plug and normal operations resume for a time.  However, the burden of clearing the plug puts unwanted strain on the pump, which may greatly reduce the lifespan of the pump.  Other times, the pump is unable to clear the plug and the pump fails.

11.     If the pump cannot clear the plug, the remedial costs can be enormous. A cost that will always occur is the cost of having to stop production to address the plug, *i.e.*, lost production time. Additionally, there is the added cost of running fishing tools down to flush out the plug, removing a failed pump, and/or buying and installing a new pump. All these scenarios have the added expense associated with production downtime, such as having to physically dispatch employees and heavy-duty equipment to the well site to actually fix the problem(s).  In the event of a pump failure, the cost of replacing the pump can run into the hundreds of thousands of dollars

when all costs are considered. For these reasons, well operators consider sand plugging a serious problem that they desperately try to avoid.

12.     Forum's SandGuard™ solves the sand plug problems described above. As shown in **Figure 2** below, the SandGuard™ is assembled into the production string of a well, above a pump. The SandGuard™ has (1) a body in the form of an outer tubing or housing; (2) an upper and lower opening; (3) a first flow path in a vented inner tubular; (4) a second flow path in an annular space around the inner tubular; and (5) a flow diverter.



**FIG. 2**

The operation of the SandGuard™ is explained in reference to **Figures 3A** to **3C** below.



**FIG. 3A**
(Normal Pumping)

**FIG. 3B**
(Pump Shutdown)

**FIG. 3C**
(Pump Restart)

13.     During normal pumping operation (**Figure 3A**), fluid and entrained sand flow upwardly into a lower opening of the SandGuard™. The upward flow then splits into two flow paths. The first flow path is through the inner tubular with a flow diverter (in the form of a ball valve) at the top. The second flow path is through the annular space surrounding the inner tubular.

14.     When the pump shuts down (**Figure 3B**), the fluid and entrained solids begin to flow downward through the production tubing by gravity. The solids are diverted into the second flow path by the flow diverter, which closes when the pump is shut down because of the absence

of upward flow. This prevents solids from collecting in the first flow path and on the pump, and instead allows them to collect in the second flow path. The vents or slots in the inner tubular help filter the sand by preventing the sand from entering the first flow path from the second flow path and by causing the sand to collect in the annular space.

15.     When the pump restarts (**Figure 3C**), the upward flow through the first flow path induces flow in the second flow path through the small vents in the inner tubular. This induced flow, as well as the flow out of the top of the first flow path around the diverter, helps progressively carry solid particles out of the second flow path and out of the top of the tool. In this way, the SandGuard™ prevents solids from collecting on the downhole pump and ingenuously allows for self-cleaning so that the SandGuard™ can be used for an unlimited number of shutdowns. The SandGuard™ also avoids the recirculation of sand, since the sand is collected above the pump rather than in the wellbore like older technologies. Thus, the SandGuard™ and patented technology provide for a self-cleaning sand fallback prevention tool that avoids the recirculation of sand through the pump.

16.     The SandGuard™ is covered by several United States Patents, which are discussed below.

## IV.     FORUM'S PATENTS

17.     United States Patent No. 9,441,435 ("the '435 Patent") entitled "Downhole Apparatus and Method" issued on September 13, 2016 after fair and full examination by the United States Patent and Trademark Office ("Patent Office"). A true and correct copy of the '435 Patent is attached hereto as **Exhibit A**.

18.     United States Patent No. 10,132,151 ("the '151 Patent") entitled "Downhole Apparatus and Method" issued on November 20, 2018 after fair and full examination by the Patent Office. A true and correct copy of the '151 Patent is attached hereto as **Exhibit B.**

19.     United States Patent No. 10,132,152 ("the '152 Patent") entitled "Downhole Apparatus and Method" issued on November 20, 2018 after fair and full examination by the Patent Office. A true and correct copy of the '152 Patent is attached hereto as **Exhibit C**.

20.     United States Patent No. 10,584,571 ("the '571 Patent") entitled "Downhole Apparatus and Method" issued on March 10, 2020 after fair and full examination by the Patent Office. A true and correct copy of the '571 Patent is attached hereto as **Exhibit D**.

21.     Forum is the sole owner of the '435, '151, '152 and '571 Patents (collectively, "Patents-in-Suit").

22.     The structure and use of the SandGuard™ is covered by claims in each of the Patents-in-Suit.

23.     At all relevant times, Forum has marked the SandGuard™ pursuant to 35 U.S.C. § 287.

## V.     DEFENDANT BORETS' INFRINGEMENT

24.     Defendant Borets manufactures, uses, sells, offers for sale and/or imports a product line it calls the SandTrapper Solids-Exclusion Device (hereinafter "Accused Product").  Borets advertises and markets the Accused Product on its website, including in multiple brochures available for download. **Exhibits E, F**. At least one of those brochures describes the following infringing characteristics of their tool (Exhibit F):

ESP shutdown due to power failure or any other reason can cause suspended solids in the production-tubing string to fall back on the pump. Restarting a plugged pump can damage upper stages or break a shaft.

The SandTrapper solids-exclusion device protects ESPs against the harmful effects of solids fallback. Located above the ESP, it eliminates the need for drain and check valves above the ESP.



SandTrapper incorporates a solids-retention chamber. A ball valve that closes when tubing flow stops prevents flowback through the ESP and potential rotor backspin. (*Fig. 1*)

Fluid in the tubing string then drains slowly through drain ports, around the valve seat, and into the solids-retention chamber where solids settle. (*Fig. 3*)

When the pump is restarted, fluid flows through slots in the solids-retention chamber, self-cleaning the chamber by circulating out settled solids to the tubing string. (*Fig. 2*)

In other words, the Accused Product is a self-cleaning fallback prevention tool that avoids the recirculation of sand, like the SandGuard and patented technology.

25.     The structure and operation of the Accused Product results in infringement of each of the Patents-in-Suit. As non-limiting examples:

- Borets infringes at least claims 1 and 4 of the '435 Patent as illustrated in **Exhibit G**;

- Borets infringes at least claims 24, 25, and 27 of the '151 Patent as illustrated in **Exhibit H**;

9

- Borets infringes at least claims 25 and 26 of the '152 Patent, as illustrated in **Exhibit I**; and

- Borets infringes at least claims 1, 6, and 13 of the '571 Patent, as illustrated in **Exhibit J**.

These identified claims are just examples.  Forum contends that many other claims of each of the Patents-in-Suit are infringed. Forum will identify all infringed claims and identify where in the Accused Product the elements of the infringed claims are found in its infringement contentions, as required by this Court's rules and orders.

26. Borets sells and offers to sell the Accused Product from its regional headquarters and sales office in Houston.

## VI.   DEFENDANT BORETS KNOWS IT INFRINGES AND CONTINUES TO DO SO ANYWAY

27. Borets used to buy Forum's SandGuard™.  Borets directly purchased SandGuard™ tools as recently as 2019. Forum prominently marks the SandGuard tools with the patent numbers in accordance with 35 U.S.C. § 287. Any person exposed to the SandGuard™ tool would immediately recognize that the tool is protected under United States patent laws, specifically the Patents-in-Suit. Borets was put on notice of the patent protected status of the SandGuard at least as early as 2019 when it purchased SandGuard™ tools directly from Forum.

28. Despite having full knowledge of the Patents-in-Suit, Borets has continued to make, sell, offer for sale, manufacture, and/or import the Accused Products, including selling the Accused Products directly into the Permian Basin.

29. On March 22, 2021, Forum sent a letter to Borets informing Borets of its infringement and demanding that it cease further infringement and provide an accounting of

Accused Products sold to date by April 9, 2021. **Exhibit K**. Thus, by at least March 22, 2021 Borets was provided direct, explicit notice of its infringement of the Patents-in-Suit.

30. Upon information and belief, after receiving the letter Borets modified its website to remove or delete references to the Accused Product. And yet, upon information and belief, Borets has continued to make, sell, offer for sale, manufacture and/or import the Accused Products, including selling them directly into the Permian Basis anyway.

31. Forum provided Borets ample opportunity to cease its infringement since providing notice of infringement on March 22, 2021.

## VII.   CAUSES OF ACTION

### <u>COUNT I</u>
**(INFRINGEMENT OF U.S. PATENT NO. 9,441,435)**

32.     Forum re-alleges the facts recited in all proceeding paragraphs as if fully set forth herein.

33.     The '435 Patent is valid and is presumed valid under 35 U.S.C. § 282.

34.     Borets is not licensed under the '435 Patent.

35.     Borets infringes, and has infringed, literally or under the doctrine of equivalents, one or more claims of the '435 Patent by importing, making, using, offering to sell/rent and/or selling/renting the Accused Products.

36.     Borets' infringement of the '435 Patent includes inducement, as Borets actively encouraged infringement by its customers, knowing that the acts Borets induced constituted patent infringement, and its encouraging acts actually resulted in direct patent infringement by Borets customers. For example, Borets' marketing material clearly instructs customers on how to use the Accused Product in an infringing manner.

37.     Borets' infringement of the '435 Patent includes contributory infringement, as there is direct infringement by Borets' customers that install or use the Accused Product, Borets knew that the combination for which its Accused Products were being made was both patented and infringing, the Accused Product has no substantial noninfringing uses, and the Accused Product is a material part of the invention.

38.     Forum is suffering irreparable harm from Borets' infringement of the '435 Patent. Forum has no adequate remedy at law and is entitled to an injunction against Borets' continuing infringement of the '435 Patent.

39.     Forum has suffered, and will continue to suffer, monetary damages as a result of Borets' infringement of the '435 Patent. Each sale or rental of the Accused Product displaces Forum's sales of its patented SandGuard™ and, therefore, Forum is entitled to lost profits or at minimum a reasonable royalty.

**COUNT II**
**(INFRINGEMENT OF U.S. PATENT NO. 10,132,151)**

40.     Forum re-alleges the facts recited in all proceeding paragraphs as if fully set forth herein.

41.     The '151 Patent is valid and is presumed valid under 35 U.S.C. § 282.

42.     Borets is not licensed under the '151 Patent.

43.     Borets infringes, and has infringed, literally or under the doctrine of equivalents, one or more claims of the '151 Patent by importing, making, using, offering to sell/rent and/or selling/renting the Accused Products.

44.     Borets' infringement of the '151 Patent includes inducement, as Borets actively encouraged infringement by its customers, knowing that the acts Borets induced constituted patent infringement, and its encouraging acts actually resulted in direct patent infringement by Borets'

12

customers. For example, Borets' marketing material clearly instructs customers on how to use the Accused Product in an infringing manner.

45.     Borets' infringement of the '151 Patent includes contributory infringement, as there is direct infringement by Borets customers that install or use the Accused Product, Borets knew that the combination for which its Accused Products were being made was both patented and infringing, the Accused Product has no substantial noninfringing uses, and the Accused Product is a material part of the invention.

46.     Forum is suffering irreparable harm from Borets' infringement of the '151 Patent. Forum has no adequate remedy at law and is entitled to an injunction against Borets' continuing infringement of the '151 Patent.

47.     Forum has suffered, and will continue to suffer, monetary damages as a result of Borets' infringement of the '151 Patent. Each sale or rental of the Accused Product displaces Forum's sales of its patented SandGuard™ and, therefore, Forum is entitled to lost profits or at minimum a reasonable royalty.

<u>**COUNT III**</u>
**(INFRINGEMENT OF U.S. PATENT NO. 10,132,152)**

48.     Forum re-alleges the facts recited in all proceeding paragraphs as if fully set forth herein.

49.     The '152 Patent is valid and is presumed valid under 35 U.S.C. § 282.

50.     Borets is not licensed under the '152 Patent.

51.     Borets infringes, and has infringed, literally or under the doctrine of equivalents, one or more claims of the '152 Patent by importing, making, using, offering to sell/rent and/or selling/renting the Accused Products.

52.     Borets' infringement of the '152 Patent includes inducement, as Borets actively encouraged infringement by its customers, knowing that the acts Borets induced constituted patent infringement, and its encouraging acts actually resulted in direct patent infringement by Borets' customers. For example, Borets' marketing material clearly instructs customers on how to use the Accused Product in an infringing manner.

53.     Borets' infringement of the '152 Patent includes contributory infringement, as there is direct infringement by Borets' customers that install or use the Accused Product, Borets knew that the combination for which its Accused Products were being made was both patented and infringing, the Accused Product has no substantial noninfringing uses, and the Accused Product is a material part of the invention.

54.     Forum is suffering irreparable harm from Borets' infringement of the '152 Patent. Forum has no adequate remedy at law and is entitled to an injunction against Borets' continuing infringement of the '152 Patent.

55.     Forum has suffered, and will continue to suffer, monetary damages as a result of Borets' infringement of the '152 Patent. Each sale or rental of the Accused Product displaces Forum's sales of its patented SandGuard™ and, therefore, Forum is entitled to lost profits or at minimum a reasonable royalty.

## COUNT IV
### (INFRINGEMENT OF U.S. PATENT NO. 10,584,571)

56.     Forum re-alleges the facts recited in all proceeding paragraphs as if fully set forth herein.

57.     The '571 Patent is valid and is presumed valid under 35 U.S.C. § 282.

58.     Borets is not licensed under the '571 Patent.

59.     Borets infringes, and has infringed, literally or under the doctrine of equivalents, one or more claims of the '571 Patent by importing, making, using, offering to sell/rent and/or selling/renting the Accused Products.

60.     Borets' infringement of the '571 Patent includes inducement, as Borets actively encouraged infringement by its customers, knowing that the acts Borets induced constituted patent infringement, and its encouraging acts actually resulted in direct patent infringement by Borets' customers. For example, Borets' marketing material clearly instructs customers on how to use the Accused Product in an infringing manner.

61.     Borets' infringement of the '571 Patent includes contributory infringement, as there is direct infringement by Borets' customers that install or use the Accused Product, Borets knew that the combination for which its Accused Products were being made was both patented and infringing, the Accused Product has no substantial noninfringing uses, and the Accused Product is a material part of the invention.

62.     Forum is suffering irreparable harm from Borets' infringement of the '571 Patent. Forum has no adequate remedy at law and is entitled to an injunction against Borets' continuing infringement of the '571 Patent.

63.     Forum has suffered, and will continue to suffer, monetary damages as a result of Borets' infringement of the '571 Patent. Each sale or rental of the Accused Product displaces Forum's sales of its patented SandGuard™ and, therefore, Forum is entitled to lost profits or at minimum a reasonable royalty.

## COUNT V
### (WILLFUL INFRINGEMENT OF THE PATENTS-IN-SUIT)

64.     Forum re-alleges the facts recited in all proceeding paragraphs as if fully set forth herein.

65.     Borets had knowledge of the Patents-in-Suit at least as early as 2019, as it purchased SandGuard tools from Forum that were prominently marked with the Patents-in-Suit. Moreover, Borets was provided express, written notice of its infringement in March 2021.

66.     After acquiring knowledge of the Patents-in-Suit, Borets directly and indirectly infringed each Patent-in-Suit by making, using, providing, selling, offering for sale, and/or importing the Accused Product and instructing others how to use the Accused Product. In doing so, Borets knew, or should have known, that its conduct amounted to infringement of the Patents-in-Suit.

67.     Borets' willful infringement entitles Forum to increased damages under 35 U.S.C. § 284 and to attorney's fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.


## VIII.   JURY DEMAND

68.     Forum asserts its right under the Seventh Amendment to the U.S. Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues so triable.

**<u>PRAYER FOR RELIEF</u>**

Forum prays for the following relief:

a.   A judgment that Defendant Borets has infringed all Patents-in-Suit under all applicable provisions of Title 35, United States Code;

b.   An award of damages adequate to compensate Forum for Borets' infringement and in no event less than a reasonable royalty, together with prejudgment and post-judgment interest;

c.   An award of lost profits;

d.   An award of increased damages for Defendant Borets' willful infringement;

e.   A permanent injunction prohibiting further infringement of the Patents-in-Suit;

f.   Such other relief as this Court or a jury may deem proper and just, including but not limited to a finding of exceptional case or willful infringement should the evidence ultimately support such a finding.

June 19, 2021                                         Respectfully submitted,


                                                     */s/ William C. Slusser*
                                                     William C. Slusser
                                                     *Attorney-in-Charge*
                                                     Texas Bar No. 18514500
                                                     **Norton, Rose, Fulbright US LLP**
                                                     Fulbright Tower
                                                     1301 McKinney Street, Suite 5100
                                                     Houston, TX 77010-3095
                                                     Telephone: (713) 651-5500
                                                     Facsimile: (713) 651-5246
                                                     bill.slusser@nortonrosefulbright.com

                                                     J. David Cabello
                                                     Texas Bar No. 03574500
                                                     Stephen D. Zinda

Texas Bar No. 24084147
**Cabello Hall Zinda, PLLC**
801 Travis Street, Suite 1610
Houston, TX 77002
Telephone: (832) 631-9990
Facsimile: (832) 631-9991
David@CHZFirm.com
Stephen@CHZFirm.com

**ATTORNEYS FOR PLAINTIFF
FORUM US, INC.**